UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

        18 CR 316 (PAC)

  -against-

        <u>MEMORANDUM</u>

MATTHEW BRADY, *et al.*,

    *Defendants.*
-----------------------------------------------------------X

    Matthew Brady's health problems render him a severe COVID-19 risk. He respectfully seeks a compassionate release sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i).

## PROCEDURAL HISTORY

    On July 30, 2019, the Court sentenced Brady to "36 months … incarceration [followed by] three years … of … supervised release [and] forfeiture … of a hundred thousand dollars." 7/30/19 Sent. Tr., ECF No. 97 at 16. His eventual release will trigger numerous "mandatory …. standard [and] special conditions … of supervision." *Id.* Brady had illegally diverted prescription medications from "2015 to 2018." *Id.* at 12.

    Brady is presently confined at FMC Lexington where he's made great rehabilitative strides coupled with a solid institutional record. As coronavirus spreads through American prisons, Brady awaits its arrival with serious health issues warranting immediate home confinement. BOP sets his release date at April 6, 2022. If adjusted 9 months for RDAP, and 6 months for halfway house, he would otherwise leave FMC Lexington around Jan. 2021. That's without *any* home confinement, even under pre-

Cares Act law (discussed *infra*). Thus, immediate home confinement would not radically alter the sentence.

On April 1, 2020, counsel sought compassionate release by written application to FMC Lexington's warden. 18 U.S.C. § 3582(c)(1)(A)(i). Alternatively, counsel sought accelerated home confinement, recently expanded under the Cares Act. Within two hours, FMC Lexington emailed that the "request has been received and will be forwarded for review." On April 2, 2020, counsel sought further information and stressed the situation's urgency.[1] On April 3, 2020, FMC Lexington replied, again eschewing specifics.[2]

## 18 U.S.C. § 3582(C)(1)(A) PERMITS IMMEDIATE JUDICIAL ACTION

"The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation." *U.S. v. Hernandez*, 18 CR 834, ECF No. 451 at 5 (SDNY) (PAE). "It presents a clear and present danger to free society for reasons that need no elaboration." *Id.* Section 3582 states:

> The court may [] modify a term of imprisonment … upon motion of the defendant after the defendant has fully exhausted all administrative rights

---

[1] Counsel wrote: "Thank you for the prompt response. I know FMC Lex is dealing with a lot right now, but might you have any sense of when Mr. Brady's application will get an individualized review? I genuinely, truly believe he is at severe risk, and obviously time is of the essence. If he's not released I intend to seek relief with the court, but I also want to first communicate with you guys as much as possible, because I am optimistic that BOP will agree he's a good candidate for home confinement."

[2] FMC Lexington wrote: "All requests for Compassionate Release/Reduction in Sentence are processed in accordance with Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), which is available on the www.bop.gov website. I am unable to provide an estimated time line. You will be notified once a decision is reached."

to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that … extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i)

But "exceptional circumstances of peculiar urgency" justify bypassing the administrative hurdles. *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993), quoting *Granberry v. Greer*, 481 U.S. 129, 134 (1987); see also 28 U.S.C. § 2254(b) (authorizing application for writ of habeas corpus absent exhausted state remedies where "circumstances exist that render such process ineffective to protect the rights of the applicant").

Specifically, "exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in [t]his unique circumstance[]—by the COVID-19 pandemic." *U.S. v. Wilson Perez,* 17 CR 513, ECF No. 98 at 2 (SDNY) (AT). For example, "[o]n March 26, 2020, Perez submitted to the BOP his application for a sentence modification." *Id.* As of his April 1 order granting relief, "the BOP has not acted on that request." *Id.* There, only 6 days has passed. By contrast, 7 days have passed since Brady's BOP application.

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992). Courts should jettison a "statutory exhaustion requirement … where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976).

"[E]xhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington*, 925 F.3d at 118. "[E]xhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* at 119. And "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id. Perez* is instructive, holding that "[a]ll three of these exceptions apply" when BOP sits on a coronavirus application for compassionate release. 17 CR 513, ECF No. 98 at 4 (collecting authorities regarding potentially deteriorating health). Like here, "even a few weeks' delay carries the risk of catastrophic health consequences." *Id.* Given "the exigency of a rapidly advancing pandemic, … administrative exhaustion would defeat, not further, the policies underlying § 3582(c)." *Id.* at 5.

# THE INSTANT CIRCUMSTANCES
# ARE EXTRAORDINARY AND COMPELLING

The U.S. Sentencing Commission's policy statement and corresponding § 3582 commentary state that a court may reduce a sentence for "extraordinary and compelling reasons," including "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A). Of course, "a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself." *Hernandez*, ECF No. 451 at 5.

"[A]t age 19, [Brady] was diagnosed with diabetes, and has been prescribed insulin." Brady's 7/23/19 Presentence Investigation Report ¶ 56 ("PSR"); 18 CR 316, ECF No. 82. He "wears an insulin pump, which monitors his insulin levels." *Id.* "The CDC and World Health Organization have both found that people with chronic medical conditions are at higher risk for experiencing more serious complications from the new coronavirus, and are at a higher risk for death." Kelly Reardon, *What COVID-19 means for people with diabetes*, 3/17/20.[3] Indeed, "diabetes" is one of the "[t]hree major conditions they have highlighted." *Id.* Matthew has "type 1 diabetes, which is an autoimmune disease." *Id.*

---

[3] https://www.wwlp.com/news/health/coronavirus-local-impact/what-covid-19-means-for-people-with-diabetes/ (last visited 3/31/20).

Even if "diabetics are not more likely to get COVID-19, the problem lies with the seriousness of the virus once infected." *Id.* "[P]eople with diabetes had higher rates of *serious complications and death* than people with the virus who do not have diabetes." *Id.* (emphasis supplied). "Diabetes that is not managed well can increase the risk for diabetes-related complications, one of which could be heart disease — another condition listed by the CDC and WHO as creating a higher risk for serious complications from COVID-19." *Id.* "The [American Diabetes Association] also says viral infections, like the new coronavirus, increase inflammation, which also happens when your blood sugar is higher than your target, contributing further to a higher risk for [diabetes related] complications." *Id.*

"People with diabetes, both type 1 and 2, have a higher risk for diabetic ketoacidosis when ill with a viral infection, or DKA — a life-threatening issue that can cause the blood to become too acidic." *Id.* "If a diabetic person is in DKA, that can make it harder to avoid sepsis and septic shock, which, according to the ADA, 'are some of the more serious complications that some people with COVID-19 have experienced.'" *Id.*

Per the Journal of the American Medical Association, the "diabetes … fatality rate" for coronavirus outstrips "chronic respiratory disease" and even "cancer." Zunyou Wu, MD, PhD and Jennifer M. McGoogan, PhD, *Characteristics of and Important Lessons From the Coronavirus Disease 2019 Outbreak in China*, 2/24/20, Journal of American

6

Medical Association ("7.3% for diabetes, 6.3% for chronic respiratory disease, 6.0% for hypertension, and 5.6% for cancer").[4]

The "American Diabetes Association" sounds these alarms, and more, in a letter directly to "[d]etention [c]enter[s]." Exhibit A, Am. Diabetes Assoc. Letter to Detention Center. They urge "officials" to "explore all possible strategies to release people with diabetes" including "compassionate release." *Id.* It is not hyperbole to say that Matthew's life is sufficiently at risk, warranting home detention.

Brady is also immunocompromised. "[I]n those with chronic medical conditions" – like him – "the body's immune response is not as strong a response when exposed to viruses."[5] *"*If such a person catches a virus … it's likely to stick around and cause complications." *Id.* But Brady's situation is worse. In "March 2018, [Brady] sought medical treatment after his throat began to close" and he broke out in hives. PSR ¶ 56. He "was diagnosed with an auto immune disease and was prescribed medication." *Id.* Brady informs that for about a year and half before jail, he was hospitalized 4 times for throat closing and hives.

Specifically, he has "idiopathic urticaris which has led to severe life-threatening anaphylaxis for which he is on immunosuppressant therapy." PSR ¶ 56. Counsel is

---

[4] https://jamanetwork.com/journals/jama/fullarticle/2762130 (last visited 3/31/20).

[5] American Heart Association, *What heart patients should know about coronavirus*, March 24, 2020; https://www.heart.org/en/news/2020/02/27/what-heart-patients-should-know-about-coronavirus (last visited 4/6/20).

informed that the illness causes difficulty breathing – (hence the aforementioned throat-closing) – and asthmatic-like conditions. Of course, "difficulty breathing" is a major coronavirus concern.[6] As recently as March 5, 2020, Brady informs that he broke out in hives, again with an itchy, swollen throat, dizziness, and light headedness. He sought medial treatment, was injected with Benadryl, and his Methotrexate dosage (discussed *infra*) was upped to 40mg per week.

He has "Vitiligo and a testosterone deficiency." PSR ¶ 56. "[E]vidence strongly suggests that vitiligo is [also] an autoimmune disorder, in which the body's immune system mistakenly targets and injures [] specific cells within your own body."[7] Brady needs "[i]mmunosuppressive drugs" which "are drugs that inhibit or prevent activity of the immune system."[8] Obviously, anyone who is "immunocompromised" is "at high-risk for severe [COVID-19] illness."[9]

Brady informs that he was taking 10 tablets per week of Methotrexate, at 2.5mg per tab – recently upped to 40mg per week. (*Supra*). "Methotrexate … is a chemotherapy agent and immune system suppressant."[10] "Common side effects include

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/index.html (last visited 4/7/20).

[7] https://www.drugs.com/health-guide/vitiligo.html (last visited 3/31/20).

[8] https://en.wikipedia.org/wiki/Immunosuppressive_drug (last visited 3/31/20).

[9] https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last visited 3/31/20).

[10] https://en.wikipedia.org/wiki/Methotrexate (last visited 3/31/20).

… increased risk of infection [and] low white blood cell counts." *Id.* I am informed that he takes 2 tablets per day of dapsone, at 25mg per tab. For that drug, "[s]evere side effects may include a decrease in blood cells [and] red blood cell breakdown."[11] People with low cell counts "are at very high risk of serious infections due to their suppressed immune system."[12] Brady informs that he also takes 30mg of Prednisone per day, three days a week to suppress the hives condition. "Prednisone is a glucocorticoid medication mostly used to suppress the immune system."[13] "Short-term side effects, as with all glucocorticoids, include high blood glucose levels." *Id.* (see diabetes discussion, *supra*).

The CDC specifically highlights "immune weakening medications" as a very serious red flag.[14] Again, it is not an exaggeration to say that Brady should be considered among the highest risk inmates. Last week, counsel spoke with Brady's doctor, "Vincent J. Calamia," who has treated Matthew "for many years." PSR ¶ 59. He observed "it's not even a question" that he is very high risk.

Brady informs that he also takes 25mg daily of Doxepin (super antihistamine), 15mg twice a day of Buspirone (anxiety), 20mg daily of Atorvastatin (cholesterol), 500mg twice daily of Metformin (diabetes), 1mg per day of folic acid, 20mg daily of

---

[11] https://en.wikipedia.org/wiki/Dapsone (last visited 3/31/20).

[12] https://en.wikipedia.org/wiki/Agranulocytosis (last visited 3/31/20).

[13] https://en.wikipedia.org/wiki/Prednisone (last visited 4/8/20).

[14] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited 4/1/20).

Lexipro (anxiety), and 15mg daily of Mirtavapine. Unsurprisingly, these medications carry laundry lists of side effects that could be disastrous in ways we are simply blind to at the present time. Given the continued uncertainty regarding exactly how coronavirus works, we should err on the side of assuming people with any significant medical history are potentially at very serious risk.

Much public coronavirus discussion has focused on the elderly, but age is not dispositive, or even the most important factor. Any "heightened health risk" warrants "home confinement." *Hernandez*, ECF No. 451 at 2-3 (ordering compassionate release for a 23-year-old with asthma). "Underlying medical conditions … increase the risk of serious COVID-19 for individuals *of any age*." (emphasis supplied).[15] The CDC stresses that "*[p]eople of all ages* with … diabetes" are "at higher risk for severe illness." (emphasis supplied).[16] It bears emphasis that the CDC says that twice on that cited coronavirus webpage, and also prints it in bold typeface. Driving home the point more grimly, "Patrick Jones, … the first known federal inmate [to] die[] of coronavirus," was only "49" years old.[17] Like Brady, he was a "low-security" inmate serving time "for a nonviolent drug crime." *Id.*

---

[15] https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf at p. 10 (last visited 4/1/20).

[16] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited 3/31/20).

[17] https://reason.com/2020/03/29/first-known-federal-inmate-dies-of-coronavirus/ (last visited).

Worse still, this virus will ravage prisons, even with the best staff and the best intentions. Recognizing the "particular concerns" of an "institutional setting," Atty. Gen. Barr warns that "[w]e want to make sure our institutions don't become petri dishes."[18] Ironically, a Federal Medical Center carries magnified risk given that "healthcare workers are getting sicker from coronavirus than other patients."[19]

The CDC warns that "[i]ncarcerated[] persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[20] Thus, "unique challenges [exist] for control of COVID-19 transmission among incarcerated[] persons, staff, and visitors." *Id.*

> Incarcerated[] persons and staff may have medical conditions that increase their risk of severe disease from COVID-19. The ability of incarcerated[] persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants. Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

*Id.*

---

[18] https://www.npr.org/sections/coronavirus-live-updates/2020/03/26/822016191/barr-federal-prisons-mustnt-become-petri-dishes-for-coronavirus (last visited 3/27/20).

[19] https://www.cnn.com/2020/03/16/health/doctors-coronavirus-health-care-hit-harder/index.html (last visited 3/27/20).

[20] https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctionaldetention.pdf (last visited 4/6/20).

In sum, "the crowded nature of municipal jails … present an outsize risk that the COVID-19 contagion, once it gains entry, will spread." *Hernandez*, ECF No. 451 at 5; Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020)[21]; *U.S. v. Nkanga*, 18 CR 713 (JMF), 2020 WL 1529535, at *1 (citing Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020).

FMC Lexington is no exception. Brady describes his living quarters as a 10 foot by 25 foot cell with 4 bunks. He informs they are double bunks, sometimes accommodating up to 8 people. There are 8 lockers, measuring about 2 feet by 1.5 feet. Brady estimates about 2 feet between the person next to him. They all share a bathroom in that room. Cells like that are lined up in an alleyway of about 24 total inmates. Lines for meals, medicine, email, and telephones leave inmates right on top of each other, often combining multiple alleyways. Brady relays that BOP recently gave them small amounts of soap, but they usually must buy it from commissary. There is no hand sanitizer. Simply put, Brady "cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus." *Perez*, ECF No. 98 at 7 (release for inmate "confined to a small cell where social distancing is impossible").

A "heightened medical risk presented to [the defendant] by the COVID-19 pandemic" constitutes "extraordinary and compelling reasons to reduce [his] sentence

---

[21] https://www.nytimes.com/2020/03/30/us/coronavirusprisons-jails.html

[by] releasing [him] from custody [and ordering] home confinement." *Hernandez*, ECF No. 451 at 4. By contrast, Brady's medical history is notably more serious than *Hernandez's*. Compare, *id.* ("It is readily apparent" that defendant's asthma is "extraordinary and compelling so as to justify compassionate release"); *U.S. v. Muniz*, 09 CR 199, 2020 WL 1540325 (KPE), at *1-2 (S.D. Tex. Mar. 30, 2020) (finding extraordinary and compelling reasons under § 3582(c)(1)(A)(i) for heightened COVID-19 risk to inmate).

Also instructive is *Perez*, who "was the victim of two vicious [jailhouse] beatings, resulting in a broken jaw and shattered bones around his eye socket." *Perez*, ECF No. 98 at 1. "[B]oth attacks sent him to the hospital and necessitated reconstructive surgeries of his face, with the second surgery requiring metal implants." *Id.* "[P]hysicians directed that he receive follow-up care [but] such care was repeatedly delayed or difficult to obtain." *Id.* "He continues to suffer from pain and persistent vision problems." *Id.* On that medical record, "the government *concede[d]* … a heightened risk of serious illness or death from COVID-19 due to his preexisting medical issues." *Id.* at 6 (emphasis supplied). The *Perez* court held that "recent surgeries, and his persistent pain and vision complications," were "extraordinary and compelling reasons" for compassionate release. *Id.* at 6-7. Again, Brady's condition dwarfs *Perez's*.

In *U.S. v. Campagna*, the court ordered compassionate release based on a "compromised immune system [with very low white blood cell counts], taken in concert with the COVID-19 public health crisis." 16 CR 78, 2020 WL 1489829, at *3 (S.D.N.Y.

Mar. 27, 2020) (LGS). That was at "Brooklyn Residential Reentry Center" – a halfway house – never mind a federal prison. *Id.* Still, that medical condition "constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide selfcare within the environment of the" halfway house. *Id.* at *3, citing U.S.S.G. § 1B1.13 cmt. n.1(A).

Brady must be "released now … because remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19." *Perez*, ECF No. 98 at 5.

## 18 U.S.C. § 3553 COMPELS RELEASE

Even where "the § 3553(a) factors[,] particularly the seriousness of [the] offenses[,] earlier led the Court to require that [the defendant] serve his entire sentence (net of statutory good time) in prison, § 3553(a) requires a sentencing court consider the … the need to provide the defendant with needed . . . medical care." *Hernandez*, ECF No. 451 at 7, citing 18 U.S.C. § 3553(a) (quotations omitted). That must be reevaluated and "[v]iewed *now* in the light of a raging and virulent pandemic." *Id.* (emphasis supplied).

Brady is no danger to the community and sentence reduction is consistent with the Commission's policy statement. U.S.S.G. § 1B1.13 (2)-(3). He is a non-violent[22]

---

[22] "[N]umerous courts" have granted relief, even to violent defendants. *Hernandez*, ECF No. 451 at 5-7 (compassionate release for defendant convicted of "racketeering" with "the Nine Trey Gangsta Bloods … with whom his violent acts were committed"), citing *U.S. v. Chandler*, 19 CR 867 (PAC), 2020 WL 1528120, at *1-3 (S.D.N.Y. Mar. 31, 2020) (granting 18 U.S.C. § 3142(i) bail application for

drug offender with no prior arrests. PSR ¶¶ 36-41. He's a low security inmate who is highly unlikely to reoffend. He's done very well in RDAP at FMC Lexington. Remarkably, "[h]e stopped using drugs in March of 2018 … long before his arrest in August of that year, and even before the arrest of" his codefendant. Brady Sent. Memo, ECF No. 95-1 at 6; 7/30/19 Sent. Tr., ECF No. 97 at 6 (observing in July 2019 that "over the last 18 months or so Mr. Brady has turned his life completely around" and had "began the process of turning himself around, of becoming sober before he got arrested"). Counsel respectfully submits that is the single best indicator of his ability to contribute productively to society if released.

Brady has strong community support and solid reentry plans. The Court may recall during sentencing, a "courtroom … virtually filled … with friends and family." 7/30/19 Sent. Tr., ECF No. 97 at 6. On home confinement, Brady would live with his wife in a one-bedroom condo located on Zoe St. in Staten Island. (full address in PSR, ECF No. 82 at 3). Obviously, Brady will be vastly safer at that address, to say nothing of other FMC Lexington inmates and staff. He is very personable, and previously worked for 13 years "performing electrical work" for "Con Edison." PSR ¶ 85.

---

felon in possession of a firearm); and citing *U.S. v. McKenzie*, 18 CR 834 (PAE), 2020 WL 1503669, at *2-3 (S.D.N.Y. Mar. 30, 2020) (granting 18 U.S.C. § 3145(c) bond pending sentencing to defendant who pled guilty to single count of assault with a deadly weapon); see also, *U.S. v. Wilson Perez,* 17 CR 513, ECF No. 98 at 1 (SDNY) (AT) (ordering compassionate release for defendant convicted of "kidnapping and conspiracy in violation of 18 U.S.C. § 1201"); *U.S. v. Campagna,* 16 CR 78, ECF No. 135 (SDNY) (LGS) (ordering compassionate release for defendant convicted of "Conspiring to Traffic Firearms in violation of 18 USC. § 371, 18 U.S.C. § 922(a)(1)(A) … and Possession and transfer of a machine gun in violation of 18 USC § 922(o)(l) and (2)").

## HOME CONFINEMENT IS A PRUDENT SOLUTION

If released, "home confinement will [continue to] meaningfully restrict his freedom of movement." *Hernandez*, ECF No. 451 at 7. Our Legislative and Executive Branches urge its use to fight this pandemic. Previously, 18 U.S.C. 3624(c)(2) controlled, stating:

> The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

But that law changed on March 27, 2020, when H.R. 748 (The Cares Act) passed. Section 12003(b)(2) of that law includes the following provision, suspending the aforementioned home detention limit, explicitly in response to coronavirus:[23]

> HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

Per section 12003(a)(2), "the term 'covered emergency period' means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus

---

[23] https://www.congress.gov/bill/116th-congress/house-bill/748/text#id39c9a7e9455546689d2aa09786f8ab6f (last visited 3/27/20).

Disease 2019 (COVID-19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates." *Id.* The President declared a national emergency on Friday, March 13, 2020.[24]

Our Attorney General specifically instructs BOP to increase home confinement for "non-violent [inmates] who pose minimal risk of recidivism." Exhibit B, 3/26/20 Atty. Gen. Letter. As discussed, *supra*, this defendant could not be a better candidate. For "safety['s]" sake, BOP should "prioritize[e] home confinement as appropriate in response to COVID-19 pandemic." *Id.* Almost every variable identified in that March 26 letter weighs in favor of home confinement here. *Id.* ("non-exhaustive list" includes medical "vulnerability," "priority [to] low security" inmates, "conduct in prison," a "demonstrated … re-entry plan" with low "recidivism" risk, and minimized "danger posed … to the community").

Days later, Atty. Gen. Barr *again* urged BOP "to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses." Exhibit C, 4/3/20 Atty. Gen. Letter. He noted that Section 12003(b)(2) of "the CARES Act now authorized me to expand the cohort of inmates who can be considered for home release," and made a specific "finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons." *Id.* "[I]nmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than

---

[24] https://time.com/5802855/trump-national-emergency-coronavirus/ (last visited 3/27/20).

17

continued detention at institutions in which COVID-19 is materially affecting their operations." *Id.* "[T]ime is of the essence." *Id.*

## **CONCLUSION**

Per the attached draft order (Exhibit D), the Court should immediately order that Brady's "sentence of incarceration in this case is reduced to time served pursuant to 18 U.S.C. § 3582(c)(1)(A); [that he] is ordered released from Bureau of Prisons custody, effective immediately; [that he] is placed on supervised release, subject to the conditions of supervised release set forth in the judgment [at ECF No. 181; and that he] shall serve [one year] of home incarceration with GPS technology at an address approved by his Probation Officer." (draft order adapted from *U.S. v. Eli Dana*, 14 CR 405, ECF No. 108 (SDNY) (JMF)).

Dated: New York, NY
April 8, 2020

Respectfully submitted,

/S/
_____
Robert Caliendo, Esq.
810 Seventh Ave., Ste. 620
New York, NY 10019
(917) 689-0114
rc@caliendo-law.com

*Attorney for Matthew Brady*